711 A.2d 371

THOMAS CORCORAN, PLAINTIFF–APPELLANT/ CROSS–
RESPONDENT, v. SEARS ROEBUCK AND COMPANY,
DEFENDANT–RESPONDENT/ CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 24, 199—Decided June 3, 1998

118

120

Before Judges DREIER, KEEFE and PAUL G. LEVY.

*Charles R. Melli, Jr.* argued the cause for appellant/cross-respondent (*Melli & Wright*, attorneys; *Brian E. Lutness*, on the brief).

*Joseph DiRienzo* argued the cause for respondent/cross-appellant (*DiRienzo & Wallerstein*, attorneys; *Mr. DiRienzo* and *James S. Rehberger*, on the brief).

The opinion of the court was delivered by

KEEFE, J.A.D.

Plaintiff, Thomas Corcoran, sustained a severe injury to his left eye while using a pair of needle nose pliers sold by defendant Sears Roebuck Corporation and manufactured by Western Forge. Plaintiff sued defendant alleging a manufacturing defect. A jury

found in favor of defendant, finding no manufacturing defect. Plaintiff appeals and defendant cross-appeals.

Plaintiff contends on appeal that the judge erred in: 1) denying plaintiff's motion to introduce into evidence the expert report of Martin Glickman, Ph.D., an expert retained but not called by the defense, as an adoptive admission; 2) improperly instructing the jury as to the use of circumstantial evidence to prove a manufacturing defect; 3) allowing defendant's expert to rely upon inadmissible hearsay concerning the manufacturing and quality control processes in effect at Western Forge in 1980; and 4) precluding plaintiff's counsel from cross-examining defendant's expert as to federal specifications which were not adopted by defendant as part of its own manufacturing specifications. We find no trial error warranting our intervention and affirm the judgment under review. Accordingly, we need not address the issues presented in the cross-appeal.

The accident occurred on October 21, 1990, while plaintiff was working in his father's driveway attempting to replace the rear brakes on his friend's station wagon. Plaintiff used his father's tools to perform the brake job. He testified that he used the subject needle nose pliers, which he described as being in "[g]ood condition," to remove without incident the brake springs from the brake assembly. Once the springs were out, plaintiff was able to remove the brake shoes. Plaintiff then began to replace the brake shoes by reversing the process.

While seated on a tire, plaintiff looked to see if the brake spring was aligned with the assembly, thereby placing his eye in line with, and within inches of, the spring. He held the needle nose pliers in his left hand, gripped the spring at approximately the pliers' eighth serration, and pulled the spring from left to right, towards his face, in an effort to reconnect the spring between the brake shoe and the brake self-adjuster. According to plaintiff, at that moment the pliers "broke," causing them to release from the spring and hit him in the left eye.

Plaintiff's father immediately drove plaintiff to the hospital. The emergency admission record indicated: "patient states a pair of needle nose pliers slipped and penetrated [his left] eyeball." Plaintiff later denied making that statement.

Upon returning home, plaintiff retrieved the needle nose pliers, which his friend had placed back in plaintiff's father's tool box, and brought the pliers to his bedroom where it remained for approximately one year to eighteen months. Plaintiff testified that he was unable to find the 1/8–inch section of the jaw tip that had broken off the pliers.

The pliers involved in this incident was manufactured by Western Forge in 1980, and sold by defendant under the Craftsman brand. Defendant admitted that the pliers had "an indefinite life provided . . . [it was] properly used and cared for."

Peter Elliot, plaintiff's expert in the areas of failure analysis, metallurgy and forensic engineering, testified that the pliers was defective when manufactured. He explained that when he examined the pliers in 1992, 1/8–inch of one of the jaws, from the tip to approximately the third serration of the pliers, was missing. He also observed that the pliers was dirty and had "bits of surface rusting and general deterioration." The fractured surface was covered with corrosion and very little of the original fractured surface was left for examination. He said his finding was consistent with the pliers having been stored in a garage-type environment for approximately eighteen months. Elliot testified that the rust corrosion found on the pliers did not have an effect upon the mechanical behavior of the tool or cause the fracture. The corrosion, in his opinion, occurred after the fracture. Elliot also observed that the fractured surface had some "superficial" damage which, in his opinion, also occurred after the fracture. According to Elliot this damage was consistent with wear and tear caused by other tools coming in contact or rubbing against the pliers. He did not observe any evidence of prior abuse of the tool. Elliot's findings, attributed to post fracture occurrences, were at odds with plaintiff's testimony that the pliers were isolated and kept in

his room after the accident, if, as plaintiff contended, the pliers broke on the date of the accident.

After observing the pliers, Elliot removed loose debris and some of the rust. He then cut a small segment off the end of the broken jaw and examined that segment under an electron microscope. He observed a series of small quench cracks and voids. The tip of the unfractured jaw was also removed and examined under the electron microscope. He also found small quench cracks on the unbroken tip.

Elliot explained that quench cracks were caused when metal, in this case steel, is heated and then quickly cooled. In his opinion, the quench cracks were caused by the improper quenching or heat treatment of the pliers. He determined that the surface features of the broken part of the pliers were typical of a brittle fracture or a "a sharp break" with no corresponding evidence of stretching. According to Elliot, a brittle fracture "occurs without warning" and is "very quick." It results from "some fault" in the heat treatment of the pliers.

Elliot also conducted hardness measurements on the pliers and determined that the tool did not deviate from the American National Standard Institute ("ANSI") standards. Additionally, the metallurgical properties were consistent with good metallurgical standards. He admitted that he had not conducted any tests on the pliers to determine whether the cracks he had discovered were sufficiently deep to cause a brittle fracture.

In contrast, Douglas McKittrick, an employee of Western Forge and defendant's expert in metallurgy and metallurgical testing, testified that the pliers was properly heat-treated and did not contain quench cracks or other manufacturing defects. McKittrick first examined the pliers in 1994, after Elliot cut off the tips. He observed that the pliers contained surface imperfections, that are common in forged tools. He said that the imperfections are not quench cracks, did not constitute a manufacturing defect, and would not cause the pliers to break.

As part of McKittrick's testimony, a slide show was presented to the jury to demonstrate the method by which pliers were manufactured at the time of the trial. According to McKittrick, Western Forge was using the same furnaces at the time of trial that had been used in 1980, when the pliers were manufactured. The furnaces had high temperature thermometers to record the temperature inside the furnace. The pliers were initially heated to 1550 degrees Fahrenheit, then dropped into oil which quickly cools the steel to 150 degrees Fahrenheit and changes the molecular structure of the steel from austenite to martinsite. "Martinsite is the hardest structure that you can form in any steel."

As the steel cools it does not contract like most other materials, but rather expands. The outside layer of the metal part of the pliers cools and hardens first into a hard outer shell. A quench crack occurs when there is an imperfection in the hard outer layer which allows the cooling inner layer to expand out. McKittrick testified that quench cracks are large, not microscopic, and follow the grain structure of the steel down towards the center of the metal. According to McKittrick, "the last place" you would expect to see a quench crack is across the tip of the jaw of the pliers, because that area is relatively thin and would cool down at approximately the same rate. Thus, quench cracks would usually occur in the thicker part of the tool.

McKittrick concluded that a ductile fracture occurred in this case. Such fractures are not caused by quench cracks, but rather by an "overload condition" or "prying" with the tip of the pliers. McKittrick explained that needle nose pliers are not designed for prying. Normal use of the pliers would not cause the tip to fracture in such a manner. Moreover, in his opinion, had the pliers been defectively manufactured they would not have lasted ten years before failing.

Additionally, McKittrick agreed with plaintiff's expert's opinion that the corrosion that had accumulated over the fractured surface had been formed as a result of exposure to a garage-type environment. However, because plaintiff had testified that the pliers had

been stored in his bedroom after the accident, McKittrick opined that the fracture and the corrosion must have occurred before the date of the accident.

## I.

Plaintiff argues that the trial judge erred in denying his motion to introduce into evidence the expert report of Martin Glickman, Ph.D., an expert retained but not called by the defense. Plaintiff proposed to offer the report of Glickman as an adoptive admission pursuant to *N.J.R.E.* 803(b)(2), because defendant supplied it in reply to an interrogatory and did not expressly state that the report was not an adoptive admission. Plaintiff also argues the trial judge erred in denying his application to use Glickman's report in his cross-examination of McKittrick.

## A.

Defendant responded to plaintiff's interrogatory 39, in which plaintiff had requested information regarding defendant's experts, that it had not "decided which, if any, person(s) it expects to call as an expert witness," and reserved "the right to supplement." Subsequently, in a letter dated June 13, 1995, defense counsel, without referring to any specific interrogatory, wrote to plaintiff's counsel:

Enclosed please find a copy of the expert report of Martin E. Glickman, Ph.D. The defendant ... hereby amends its answers to interrogatories to include this report and name Dr. Glickman as an expert who may be called to testify at the time of trial. I have also orally conferred with Dr. Glickman concerning the presence of quench cracks and he advises that based on his observations he finds no sign of quench cracks and therefore this issue was not included in his report.

In his report, Glickman wrote that the metallurgical structure of the pliers was "fully consistent with the ANSI specifications and the observed hardness values measured by the plaintiff's expert." He concluded that the pliers was "properly heat treated," and the fracture was caused by a reasonably fit man squeezing forcefully on the steel brake spring and pulling the spring against one of the jaws of the pliers. Glickman also concluded that

[t]he ductile [not brittle] overload fracture of this pliers tip occurred suddenly, and without warning; the user would have had little or no chance to detect the onset of the impending fracture. Upon fracturing, the pulling force was released suddenly, unbalancing the applied forces. The user, caught unaware, could not adjust the pulling force quickly enough, thereby allowing acceleration towards his face of the pliers and his hand and arm. Thus, the plaintiff's description of the subsequent accident seems entirely consistent with the fracture of the pliers tip and its sequelae.

Plaintiff requested that he be permitted to refer to Glickman's report in his opening statement and informed the court that he intended to offer it into evidence as an adoptive admission. Defense counsel maintained that he had informed plaintiff that Glickman was withdrawn as an expert. Glickman was apparently withdrawn because he had refused to conduct tests on pliers to support his conclusion that the pliers could be broken by squeezing on a hard object and also because McKittrick disagreed with that conclusion.

■■■ The trial judge held that Glickman's report was not an adoptive admission. We agree with the trial judge. Expert's reports are statements but, unlike answers to interrogatories, are not statements of a party and therefore cannot be treated as an admission simply because a party furnished them in discovery. *Skibinski v. Smith,* 206 *N.J.Super.* 349, 353, 502 *A.*2d 1154 (App. Div.1985). The reports themselves are hearsay and generally are not admissible. *Hill v. Cochran,* 175 *N.J.Super.* 542, 546–47, 420 *A.*2d 1038 (App.Div.1980).

■■■ *N.J.R.E.* 803(b), however, provides an exception to the hearsay rule for

(b) A statement offered against a party which is:

. . . .

(2) a statement whose content the party has adopted by word or conduct or in whose truth the party has manifested belief. . . .

An expert's report can be admissible as an adoptive admission of a party pursuant to *N.J.R.E.* 803(b)(2) in some instances when the party provides the report in response to specific interrogatories and thus adopts the contents as its admission. *Ratner v. General Motors Corp.,* 241 *N.J.Super.* 197, 201 n. 2, 574 *A.*2d 541 (App.Div.

1990); *Skibinski, supra,* 206 *N.J.Super.* at 354, 502 *A.*2d 1154; *Mehalick v. Schwartz,* 223 *N.J.Super.* 259, 262, 538 *A.*2d 458 (Law Div.1987).

In determining whether the submission of an expert's report is an adoptive admission, courts have focused on the wording of the interrogatory. For example, in *Skibinski, supra,* this court held that the plaintiff's attachment of the expert's report to his answers to interrogatories did not constitute an adoptive admission, because the interrogatories propounded by the defendants had merely contained a request for a copy of an expert's report. *Ibid.* Thus, we held that a response to that interrogatory did "not produce admissions that can be used to limit the expert's testimony at trial." *Ibid.*

Similarly, in *Mehalick v. Schwartz, supra,* the defendant doctor in a medical malpractice case sought to introduce the plaintiffs' expert report in evidence. The court held the report was inadmissible and explained that the interrogatories served by the defendant "simply asked for the names and addresses of expert witnesses, the subject matter on which the expert was to testify, a summary of the grounds for each opinion, and for a copy of the report pursuant to *R.* 4:17–4(a)." *Id.* at 263, 538 *A.*2d 458. "The interrogatory as worded did not ask for factual information from plaintiff which was within plaintiff's knowledge as in *Sallo [v. Sabatino,* 146 *N.J.Super.* 416, 419, 370 *A.*2d 25 (App.Div.1976)], but rather asked for the opinion to be given by the expert and as a result cannot be considered as an adoptive admission of plaintiffs." 223 *N.J.Super.* at 263, 538 *A.*2d 458.

Here plaintiff asked for "the substance of *the facts* and opinions as to which the expert is expected to testify" in interrogatory 39(b), and thus, if defendant had responded "see attached expert's report" to that interrogatory, Glickman's report would have constituted an adoptive admission. *Skibinski, supra,* 206 *N.J.Super.* at 354, 502 *A.*2d 1154. But defendant never responded to interrogatory 39 by referring to Glickman's report, and therefore it did not constitute an adoptive admission.

There is nothing in defendant's correspondence indicating that defendant adopted the contents of Glickman's report. Moreover, there is no indication that defendant submitted that report in response to any specific interrogatory—for example, to question 39(b) which asked for the facts and opinions to which the expert is expected to testify, or to 39(c) which asked for a summary of the basis for each opinion. Defendant might have been simply responding to question 39(e), which simply asked for copies of all experts' reports.

If plaintiff wanted to determine whether defendant was adopting Glickman's report, he could have moved for more specific answers to interrogatories. *R.* 4:23–1. If he had, and if defendant had responded to interrogatory 39, "see my expert's report," or answered 39(b) using the content of Glickman's report, the report or answer would have been admissible. Plaintiff, however, did not move to compel defendant to do so; thus, the trial judge properly held that the report was inadmissible under the adoptive admission exception to the hearsay rule. *N.J.R.E.* 803(b)(2); *Skibinski, supra.*

▮ Nevertheless, plaintiff argues that defendant's failure to include a disclaimer that the report was not an adoptive admission in its letter of June 13, 1995, compels the conclusion that defendant was relying upon the report and that it was an adoptive admission. A party may include "[a]n expression that the party does not adopt the report" and such an expression "is a sufficient disclaimer of the report." *Serrano v. Levitsky,* 215 *N.J.Super.* 454, 458, 521 *A.*2d 1377 (Law Div.1986). That is not to say however, that the failure to include a disclaimer automatically converts the report to an adoptive admission. Plaintiff provides no authority for that proposition, and we fail to find a basis for it in the principles that undergird *N.J.R.E.* 803(b) or our case law.

### B.

Next, plaintiff argues that the trial judge erred in denying his application to use Glickman's report in his cross-examination of

McKittrick. During the trial, the judge conducted a *N.J.R.E.* 104 hearing to determine if McKittrick had relied upon Glickman's report in formulating his conclusions.

In McKittrick's initial report submitted to plaintiff in November 1994, he concluded that there were "no manufacturing or metallurgical defects present in the [pliers]," and that "[t]he failure of the tool was not associated with a quench crack." However, McKittrick stated that he was "unable to form a final opinion on the cause of failure of the tool in question as several important pieces of information are not available." He noted that if the portion of the pliers that had been cut could be removed from its plastic casing, which it ultimately was, then "additional information could be gathered to help in the formation of a final opinion."

McKittrick also testified at the hearing that he had received Glickman's report at least by June 1995 and admitted that he had reviewed the report and that some of Glickman's comments had confirmed his initial opinions. McKittrick testified, however, that he had not relied upon Glickman's report in formulating his conclusions, essentially because he disagreed with Glickman's conclusion that a reasonably fit man could fracture the tip of the pliers by squeezing on a hard object. McKittrick testified that "[m]y experience using these tools told me that these tools don't fail in that manner." As such, McKittrick testified that he had disagreed with Glickman's conclusion that plaintiff's description of the accident was "entirely consistent with the fracture of the pliers' tips." He also disagreed with some of the methodology used by Glickman, and stated that Glickman's assumptions on the strength and hardness of the material used to make the pliers were not consistent with Western Forge's testing.

After receiving Glickman's report, McKittrick performed testing to determine if a person could break the tips of the pliers by squeezing and pulling a spring and found that it could not be done. McKittrick testified that before he had conducted those tests he was of the opinion that the pliers would not fail, and it did not.

The trial judge denied plaintiff's motion to permit him to use Glickman's report for purposes of cross-examination. The judge found that McKittrick had not relied upon Glickman's report in formulating his opinions, and thus, it was not admissible to impeach McKittrick's credibility. Plaintiff was therefore precluded from admitting Glickman's report because it was "impermissible hearsay," that is, an opinion that could not be tested by cross-examination.

It is improper to cross-examine a witness about inadmissible hearsay documents upon which the expert has not relied in forming his opinion. *State v. Pennington*, 119 *N.J.* 547, 577–83, 575 *A.*2d 816 (1990), *overruled on other grounds by State v. Brunson*, 132 *N.J.* 377, 625 *A.*2d 1085 (1993). Because the trial judge's finding that McKittrick did not rely upon Glickman's report in forming his conclusion was supported by the evidence taken at the *N.J.R.E.* 104 hearing, the trial judge did not abuse his discretion in precluding plaintiff from cross-examining McKittrick on the contents of Glickman's report.

In an analogous case, *Crispin v. Volkswagenwerk AG*, 248 *N.J.Super.* 540, 551–52, 591 *A.*2d 966 (App.Div.), *certif. denied*, 126 *N.J.* 385, 599 *A.*2d 162 (1991), we held that the trial judge did not err in precluding the defense attorney from questioning the plaintiff's expert in a products liability case concerning conclusions reached in a government agency's report. The court found that although plaintiff's expert had supervised the product testing described in the report while he was employed by the agency, "he did not participate in the preparation of the 'conclusions' and 'final observations' of the ... report." *Id.* at 551, 591 *A.*2d 966. Additionally, the report was released to the public after the expert had left the agency, the expert "was not aware of the fact that the report had been issued[,] and [the expert] disagreed strenuously with the conclusions contained in the document." *Id.* at 551–52, 591 *A.*2d 966.

Even if we were to conclude that McKittrick had relied upon Glickman's opinion in formulating his conclusions, reversal is not

warranted because plaintiff cannot show prejudice. *R.* 2:10–2. It must be remembered that Glickman stated in his report that the pliers had been properly heat-treated, complied with ANSI hardness specifications, and did not contain quench cracks. Thus, Glickman's conclusions were contrary to plaintiff's expert's conclusions and did not support plaintiff's theory that the pliers had been improperly manufactured. While Glickman's conclusion that a reasonably fit person could break the pliers by pulling on them, and "the plaintiff's description of the subsequent accident seems entirely consistent with the fracture of the pliers' tip" to support a design defect theory, that theory was not presented by plaintiff in this case. Thus, the evidence was irrelevant as to plaintiff's liability theory.

## II.

Plaintiff argues, as plain error, that the trial judge's charge on the use of circumstantial evidence to prove a manufacturing defect was erroneous and confusing.

During the charge conference, the trial judge stated that he intended to charge the jury in accord with *Model Jury Charge (Civil)* § 5.34(c) (1989), entitled "Manufacturing Defect," which provides as follows:

A manufacturing defect may be established by proof that as a result of a defect or flaw which happened during production or while in defendant's control, the product failed to perform safely.

You must decide what the condition of the product as planned should have been according to defendant's design specifications or performance standards and what its condition was as it was made. If you find there is no difference between the two conditions, then you cannot say there was a manufacturing defect. If there was a difference, you must decide if that difference made the product not reasonably safe for its intended or reasonably foreseeable uses. If the answer is "yes" then you have found the product to be defective. Plaintiff need not prove that defendant knew of the defect nor that defendant caused the defect to occur.

In judging whether there was a manufacturing defect in the (product), this may be shown to you by the plaintiff in one of three ways. First of all, it may be demonstrated by direct evidence, such as a defective part. Secondly, you may infer that there was a defect by reasoning from the circumstances and facts shown. Third, if you find from the evidence that there is no other cause for the accident other than a manufacturing defect, you may find a defect existed.

Defendant objected to the charge on the ground that plaintiff had failed to present any evidence from which the jury could infer that there was a defect. Plaintiff, however, did not object to the charge. The trial judge overruled defendant's objection. The judge's charge was substantially similar to *Model Jury Charge (Civil)* § 5.34(c), *supra*, and was also substantially in accord with plaintiff's request to charge.

Plaintiff now argues that the judge's charge was confusing because the jury "might have believed that plaintiff had to prove that there existed a specific difference or defect from the design specification or performance standards in order to find a manufacturing defect." Plaintiff contends the trial judge should have "told the jury in the alternative, if the plaintiff could not or did not prove a specific defect they could infer from circumstantial evidence that there was a defect."

It is fair to infer from plaintiff's failure to object to the charge that, in the context of the trial, any confusion created by the instruction which went unnoticed by skilled counsel was equally insignificant from the jury's perspective. *State v. Macon*, 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971); *Graves v. Church & Dwight Co.*, 267 *N.J.Super.* 445, 465, 631 *A.*2d 1248 (App.Div.), *certif. denied*, 134 *N.J.* 566, 636 *A.*2d 523 (1993). Nevertheless, some discussion is warranted to determine whether there was plain error, that is, error "clearly capable of producing an unjust result." *R.* 2:10–2.

▮▮▮ "[I]n a products liability case the injured plaintiff is not required to prove a specific manufacturer's defect." *Moraca v. Ford Motor Co.*, 66 *N.J.* 454, 458, 332 *A.*2d 599 (1975); *accord Consalo v. General Motors*, 258 *N.J.Super.* 60, 64, 609 *A.*2d 75 (App.Div.) (explaining that an "inability to prove a defect by direct evidence is not fatal to a plaintiff's case"), *certif. denied*, 130 *N.J.* 597, 617 *A.*2d 1220 (1992). "If the proofs permit an inference that the accident was caused by some defect, whether identifiable or not, a jury issue as to liability is presented." *Moraca, supra*, 66 *N.J.* at 458, 332 *A.*2d 599.

Thus, where direct evidence is unavailable, "a plaintiff may prove a defect either by circumstantial evidence which would permit an inference that a dangerous and defective condition existed prior to sale, or by negating other causes in order to make it reasonable to infer that a dangerous condition existed while defendant had control of the product." *Consalo, supra,* 258 *N.J.Super.* at 64, 609 *A.*2d 75 (citing *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 170, 406 *A.*2d 140 (1979)). "[A]dditional circumstantial evidence, such as proof of proper use, handling or operation of the product and the nature of the malfunction, may be enough to satisfy the requirement that something was wrong with it." *Scanlon v. General Motors Corp.,* 65 *N.J.* 582, 591, 326 *A.*2d 673 (1974).

The trial judge correctly charged the jury that it could "infer that there was a defect by reasoning from the circumstances and facts shown." Contrary to plaintiff's representation, the judge did not charge the jury that "plaintiff *must* establish a specific defect," although a manufacturing defect can be established by direct evidence and plaintiff attempted to prove as much.

The trial judge charged the jury substantially in accord with the model charge to the effect that plaintiff could establish a manufacturing defect "in *one of three* ways: first of all, it may be demonstrated by direct evidence[,] such as a defective part; secondly, you may infer that there was a defect from the circumstances and facts shown; third, if you find from the evidence that there is no cause for the accident other than a manufacturing defect, you may find a defect existed." In our view the instructions gave plaintiff more than the facts warranted.

### III.

Plaintiff argues that the trial judge erred in allowing McKittrick to testify as to the manufacturing and quality control processes in effect in 1980 because such testimony was based upon inadmissible hearsay.

McKittrick admitted that he had been employed at Western Forge only since 1990, while the pliers involved in this case were manufactured in 1980. He admitted that there were no written records describing the quality assurance procedures utilized in 1980, nor were there any records to show whether the batch from which the subject pliers came were tested.

In the absence of written documents, McKittrick derived his knowledge from talking to people who had worked for Western Forge in 1980. He said that it was a "part of [his] job . . . to know what [everyone was] doing at Western Forge." As such, he became "quite familiar with the quality procedures," including hardness testing that was followed in 1980.

According to McKittrick, Western Forge had been conducting hardness tests on its tools for years, and some of its hardness testers dated "back before anybody in [the] courtroom was . . . born." He learned through his inquiry that in 1980, the year these pliers were manufactured, hardness testing was done on samples from every batch of pliers to determine if they were properly heat treated. If any of the test pliers failed the hardness testing the whole batch was "quarantined."

Plaintiff's objection to the admission of McKittrick's testimony as to the quality control procedures employed by Western Forge in 1980, on the ground that it was inadmissible hearsay, was overruled. On appeal, plaintiff contends that the hearsay upon which McKittrick relied in the subject portion of his testimony "should have been excluded as it does not meet or fall within any of the exceptions to the hearsay rule under *N.J.R.E.* 803 or *N.J.R.E.* 804." No other authority is cited in support of plaintiff's argument.

Plaintiff fails to consider the provisions of *N.J.R.E.* 703. McKittrick was both an employee of defendant and an expert witness in the case. Accordingly, as an expert he was permitted to rely upon facts constituting hearsay, so long as they are "of a type reasonably relied upon by experts in the particular field in

forming opinions or inferences upon the subject." *Ibid.* The hearsay statements so considered are not admitted to establish the truth of their contents, but to apprise the jury of the basis of the expert's opinion. *Blanks v. Murphy,* 268 *N.J.Super.* 152, 163–64, 632 *A.*2d 1264 (App.Div.1993).

An expert need not rely solely upon documentary hearsay statements in order to qualify under the rule. It is equally permissible to rely upon "interviews" and "discussions" with persons having relevant knowledge for the formation of an opinion. *Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 281–89, 579 *A.*2d 1241 (1990); *State v. Smith,* 262 *N.J.Super.* 487, 521, 621 *A.*2d 493 (App.Div.), *certif. denied* 134 *N.J.* 476, 634 *A.*2d 523 (1993). McKittrick's conversations with co-employees concerning the production and quality control process in 1980 were in the nature of the "interviews" and "discussions" that were the subject of the foregoing cases. Had the objection been focused on *N.J.R.E.* 703 at the time of trial, the judge would have been alerted to inquire into the issue of whether experts in the field, about which the McKittrick was testifying, reasonably rely on information of that type. *Ryan, supra,* 121 *N.J.* at 289, 579 *A.*2d 1241. As the record stands, there was no such inquiry because the objection was not properly focused. Thus, we examine the issue in the context of plain error.

McKittrick testified that he was employed by Western Forge in the capacity of a metallurgical engineer and product safety officer. In that capacity he was involved in material selection and "recipes for how our material's (sic) supposed to be heat treated and annealed." His duties took him to "the production floor and getting [his] hands dirty, looking at parts." Another function he performs is "to appear in court and talk technically about what we do and explain what we do." In specific reference to his familiarity with the procedures in use in 1980, McKittrick explained that he learned them "as part of my job," only a part of which is testifying as an expert. In light of the fact that defendant's record retention policy was such that actual quality control

records for that period would have been destroyed by the time McKittrick became employed by defendant, it is natural that he would seek out this type of information to perform his job description within the company. Thus, based upon the record, we think it is self-evident that the hearsay statements upon which McKittrick relied were of the type anyone in his position would naturally rely upon. The admission of the testimony did not constitute plain error.

But even if we were to concede error for the purpose of discussion, the error was harmless. Under the New Jersey Product Liability Act, a product that causes harm is defective in the manufacturing context if it "deviated from the design specifications, formulae, or performance standards of the manufacturer." *N.J.S.A.* 2A:58C–2a. As we understand the record, the engineering prints containing the specifications relevant to the product as it was intended to be manufactured in 1980 were available for review and comparison against the actual pliers that caused plaintiff's injury. As McKittrick testified, he did not need the quality control records pertaining to the batch, of which the subject pliers was a member, to determine whether it met specifications, so long as he had the tool and the specifications to compare it against. He was correct.

The injury-causing product may be measured against the same product as manufactured according to the manufacturer's standards. If the particular product used by the plaintiff fails to conform to those standards or other units of the same kind, it is defective.

[*O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 181, 463 *A.*2d 298 (1983) ].

Even if defendant had the best quality control in the world, if the pliers was defective because it deviated from defendant's specifications, and the defect caused plaintiff's injuries, defendant would be liable. *Id.* at 180, 463 *A.*2d 298. That is the essence of strict liability in tort.

Thus, we disagree with plaintiff's contention that the hearsay information that McKittrick relayed through his testimony was "at the heart of the case." Rather, it was at best a tangential issue and at worst irrelevant. In any event, it did not have the capacity

to prejudice plaintiff. The judge's instructions to the jury proper-
ly focused the jury's attention on the thrust of plaintiff's liability
theory and the simple question of whether the product deviated
from defendant's manufacturing specifications.

## IV.

Plaintiff argues that the trial judge erred in precluding the
cross-examination of McKittrick as to federal specifications which
were not adopted by defendant as part of its manufacturing
specifications.

In response to interrogatories propounded by plaintiff, defen-
dant stated that it had adopted some sections of the Federal
Specification GGG–P–471E, published by the General Services
Administration, as part of its manufacturing specifications. De-
fendant listed the specific sections it had adopted.

During cross-examination plaintiff attempted to question McKit-
trick concerning why defendant had not adopted several other
sections of those federal specifications in its manufacturing pro-
cess. Defense counsel objected. Plaintiff's counsel conceded that
defendant was not obligated to adopt or follow any of the GGG–P–
471E specifications.

Nevertheless, plaintiff wanted to ask McKittrick why defendant
had not adopted GGG–P–471E § 3.6.2 (Jaw Hardness), which
provided that "jaws shall show a hardness value of not less than 45
and not more than 60 on the Rockwell 'C' scale when tested as
specified in 4.3.1 [Hardness]"; GGG–P–471E § 3.8.1 (surfaces)
("All surfaces shall be free from pits, nodules, burrs, cracks, and
other defects which may adversely affect the performance of the
tool. Surfaces usually ground or otherwise finished and provided
with one of the coatings specified in 3.8.2 [Coatings] shall have a
maximum surface roughness of 63 microinches. . . . "); GGG–P–
471E §§ 4.1 (Responsibility for inspection); 4.1.1 (Inspection of
materials and components); 4.2 (Sampling procedures); 4.3 (Test-
ing); 4.3.1 (Hardness), 4.3.1.1 (Pliers with cutting edges); and
4.3.2 (Handle-load tests). The trial judge held that plaintiff could

not cross-examine McKittrick as to why defendant had not adopted the above-cited specifications because the specifications were only relevant to a design defect case, not a manufacturing defect case. We agree.

Much of what we said in our discussion of the previous issue concerning the focus of proofs in a manufacturing defect case apply here as well. The federal specifications adopted by Western Forge were relevant and properly admitted to establish the manufacturing standards employed by Western Forge against which the offending product must be compared. *N.J.S.A.* 2A:58C–2a. In contrast, the federal specifications that were not adopted by Western Forge in its manufacturing process were not relevant to the determination of this action because they were not used by Western Forge in its own design or performance specifications. Thus, the only relevant inquiries were what specifications did defendant use in manufacturing these pliers, and whether the pliers complied with such specifications. The specifications mentioned above not adopted by defendant were not relevant to that determination.

Whether the federal standards were or were not minimal standards, whether those standards should have been adopted, and whether the failure to adopt them resulted in a product defect would have been relevant in a design defect case. But this was not such a case. Plaintiff's expert did not testify that the federal specifications cited by plaintiff should have been adopted by defendant, or that the failure to do so resulted in the defect. Therefore, the trial judge did not err in sustaining defendant's objection.

Affirmed.