**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3705-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

S.B.,

    Defendant-Appellant.

_____

Submitted January 22, 2018 — Decided June 27, 2018

Before Judges O'Connor and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 14-03-0417.

Miller, Meyerson & Corbo, attorneys for appellant (Gerald D. Miller, of counsel and on the briefs).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).

PER CURIAM

    Defendant S.B. was charged in an indictment with first-degree kidnapping, N.J.S.A. 2C:13-1(b) (count one); third-degree criminal restraint, N.J.S.A. 2C:13-2 (count two); third-degree aggravated

assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) (count four); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count five); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count six); third-degree aggravated assault with an attempt to cause significant bodily injury, N.J.S.A. 2C:12-1(b)(7) (count fourteen); third-degree terroristic threats, N.J.S.A. 2C:12-3(a) (count fifteen); and eight counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a) (counts three, seven, eight, nine, ten, eleven, twelve, and thirteen).

Following a February 2015 jury trial, defendant was found not guilty of count four and count fourteen. The jury could not reach a verdict on the remaining charges, and defendant was retried in September 2015.

The record of the re-trial shows that in August 2013, twenty-six-year-old K.G. went to the Hudson County Social Services office in Jersey City. She locked her keys in her car and encountered defendant, who assisted her in gaining entry to her vehicle. Defendant said he was a supervisor at Social Services and that he had employment positions he needed to fill. In fact, defendant worked in a nearby office's mailroom. K.G. gave defendant her phone number.

The next morning, defendant sent K.G. a text message requesting her resume. K.G. then met defendant in the parking garage where she encountered him the previous day, and gave him her resume in an envelope. Defendant told K.G. he would attempt to set up an interview for her the following day.

The next day, defendant sent a text message to K.G. advising that he had "good news." Defendant spoke to K.G. over the phone, said he scheduled her interview for the following week, and asked if she would meet him at a bowling alley to talk about the position and "hang out." K.G. agreed.

When K.G. later arrived at the bowling alley, defendant said he did not have any cash and needed to return to his apartment. K.G. agreed to accompany him, and they went to defendant's apartment together.

Once inside of the apartment, K.G. observed that defendant had a knife in his hand. According to K.G., defendant struck her in the face, said "shut up, bitch," put the knife to her back, and guided her to the bedroom. Defendant told K.G. that she and her brother had robbed him, and directed that she remove her clothes so that he could look for a tattoo. K.G. removed her clothes, and defendant said she was not the person who had robbed him and told her to put her clothes back on. Moments later, defendant told

K.G. he did not like the way she looked at him, and ordered her to remove her clothes again.

K.G. testified that defendant continued to threaten her with the knife, forced her to perform fellatio, and tied her hands and feet to the bed with belts. Over the course of the following six hours, defendant struck and punched K.G., threatened her, and repeatedly penetrated her vaginally and anally. K.G. also reported defendant performed cunnilingus against her will.

When defendant fell asleep in the bed with the knife in his hands, K.G. wriggled free from the restraints and stabbed defendant in the neck and chest, believing it would slow him down if he pursued her. Defendant awoke, and ran to the bathroom. K.G. fled the apartment.

K.G. knocked on the door of a nearby apartment and screamed for help. Defendant pursued K.G., and attempted to pull her back into his apartment. Still armed with the knife, K.G. stabbed defendant, who punched K.G. in the mouth. K.G. continued stabbing defendant until the blade broke apart from the knife's handle.

K.G. ran to another apartment, where Lucius Williams answered the door and called 9-1-1. Williams testified that K.G. was naked, covered in blood, and appeared "hysterical" and "terrified." After the police arrived, K.G. was transported to the hospital where a

nurse photographed her injuries and conducted a sexual assault rape kit examination.

Jersey City Police Officer Patrick Kenneth Egan testified he was dispatched to the scene, and observed that K.G. had scrapes and scratches on her body, a bruised face, a cut on her lip, a bruised wrist and a laceration on her left arm. Egan found defendant lying face-down in the hallway. Defendant was also transported to the hospital.

During the subsequent investigation, the police recovered the knife handle and blade from the scene, as well as gray and black belts, a Viagra pill, two condom wrappers and two used condoms from defendant's apartment. Investigators also recovered security camera recordings from the parking garage where K.G. and defendant first met and from the mailroom in which defendant was employed. The recordings showed K.G. and defendant together in the garage. Hudson County Prosecutor's Office Detective David Abromaitis testified that the recordings, which were played for the jury, also showed defendant holding the envelope in the garage and later opening a manila envelope and placing the envelope on a table in the mailroom. Abromaitis testified without objection that he "believed" the envelope contained K.G.'s resume.

The trial evidence also showed the results of a forensic analysis of swabs and samples recovered from the rape kit

examination, and a buccal swab obtained from defendant. New Jersey State Police Laboratory forensic scientist Linnea Schiffner was qualified as an expert in the area of forensic DNA analysis. Schiffner explained that the DNA tests and analysis she performed established that defendant was the source of the blood found on K.G.'s back and right leg, and that he was a possible DNA contributor to what may have been saliva taken from K.G.'s vaginal swabs. Schiffner's testified in detail concerning her report describing the results of the DNA analysis, and the report was admitted in evidence without objection.

The jury found defendant guilty of: count one, first-degree kidnapping, N.J.S.A. 2C:13-1(b); count two, third-degree criminal restraint, N.J.S.A. 2C:13-2; count three, first-degree aggravated sexual assault during a kidnapping, N.J.S.A. 2C:14(a)(3); count thirteen as amended, second-degree sexual assault by force, N.J.S.A. 2C:14-2(c)(1); count fourteen as amended, simple assault, N.J.S.A. 2C:12-1(a); and count fifteen, third-degree terroristic threats, N.J.S.A. 2C:12-3(a). Defendant was acquitted of the remaining charges.

Following the merger of the offenses at sentencing, the court imposed a sentence of life without parole subject to the requirements of the No Early Release Act, N.J.S.A. 2C:43-7.2, on the first-degree kidnapping charge, and concurrent sentences on

A-3705-15T4

the remaining charges. The court ordered that defendant serve the special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and comply with the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23.

Defendant appealed, and presents the following arguments for our consideration:

> POINT I
>
> THE TESTIMONY OF A STATE'S WITNESSES INVADED THE PROVINCE OF THE JURY AND DEPRIVED THE DEFENDANT OF HIS RIGHT TO HAVE HIS GUILT DETERMINED BY THE JURY[.]
>
> POINT II
>
> THE REPORT OF [THE] STATE'S FORENSIC EXPERT WAS ERRONEOUSLY ADMITTED INTO EVIDENCE[.]
>
> POINT III
>
> [] [DEFENDANT] WAS DEPRIVED OF A FAIR TRIAL BECAUSE OF ERRORS IN THE VERDICT SHEET SUBMITTED TO THE JURY[.]
>
> POINT IV
>
> [DEFENDANT] WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL[.]
>
> a. TRIAL COUNSEL FAILED TO OBJECT TO TESTIMONY OF A STATE'S WITNESS [WHICH] INVADED THE [PROVINCE] OF THE JURY AND DETERMIN[ATIONS] BY THE JURY[.]
>
> b. TRIAL COUNSEL DID NOT OBJECT TO THE REPORT OF STATE'S FORENSIC EXPERT ADMITTED INTO EVIDENCE[.]

A-3705-15T4

[c.] TRIAL COUNSEL FAILED TO OBJECT TO AN ERRONEOUS VERDICT SHEET WHICH WAS SUBMITTED TO THE JURY[.]

[d.] TRIAL COUNSEL FAILED TO MAKE A MOTION FOR A NEW TRIAL THAT THE VERDICT OF THE JURY WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE[.]

Defendant's supplemental brief raises the following arguments:

POINT I

THE COURT SHOULD NOT HAVE DELIVERED A SUPPLEMENTAL INSTRUCTION WHEN THE JURY STATED IT WAS DEADLOCKED ON SOME CHARGES.

POINT II

[DEFENDANT] WAS DEPRIVED OF DUE PROCESS BY NOT HAVING THE DOCTOR WHO TREATED HIM CALLED AS A DEFENSE WITNESS.

Defendant makes the following arguments in his pro se brief:

POINT I

TRIAL COUNSEL WAS INEFFECTIVE FOR NOT ALLOWING DEFENDANT TO TAKE THE STAND TO SHOW K.G. VOLUNTARILY CAME TO DEFENDANT'S PLACE OF RESIDENCE.

POINT II

TRIAL COUNSEL WAS INEFFECTIVE FOR NOT INFORMING DEFENDANT A POTENTIAL CONFLICT OF INTEREST [THAT] EXISTED SINCE TRIAL COUNSEL REPRESENTED THE COUNTY OF HUDSON IN [A] LEGAL MATTER AND WAS AN EMPLOYEE OF JERSEY CITY.

POINT III

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE WAY THE TRIAL COURT HANDLED THE

JURY NOTE THAT SAID JURORS AGREED ON SOME
COUNTS BUT WERE AT AN IMPASSE ON OTHERS.

POINT IV

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
REQUEST TO SHOW THE VIDEO FOOTAGE OF K.G.
INTERVIEW SHOWING [] K.G.'S DEMEANOR WAS
CONSISTENT WITH A PERSON WHO DID NOT TAKE
THEIR PRESCRIBED MEDICATION.

I.

We consider each of the trial court's alleged errors under
the plain error standard, R. 2:10-2, because defendant did not
object to the admission of the evidence or the court's jury
instructions concerning errors in the verdict sheet. Under the
plain error standard, defendant must demonstrate the alleged
errors were "clearly capable of producing an unjust result." R.
2:10-2. That is, the errors must be "sufficient to raise a
reasonable doubt as to whether [they] led the jury to a result it
otherwise might not have reached." State v. R.B., 183 N.J. 308,
330 (2005) (quoting State v. Bankston, 63 N.J 263, 273 (1973));
see also State v. Macon, 57 N.J. 325, 336 (1971).

A.

Defendant first argues it was plain error to admit
Abromaitis's testimony that he "believed" the folder defendant
held in the security recordings contained K.G.'s resume. He argues

9

the testimony constituted an impermissible lay opinion which invaded the province of the jury's fact-finding function.

"Lay witnesses may present <u>relevant</u> opinion testimony in accordance with Rule 701, which permits 'testimony in the form of opinions or inferences . . . if it . . . is rationally based' on the witness' 'perception' and 'will assist in understanding the witness' testimony or in determining a fact in issue." <u>State v. Lazo</u>, 209 N.J. 9, 22 (2012) (alteration in original) (emphasis in original) (quoting N.J.R.E. 701).

In <u>State v. McLean</u>, 205 N.J. 438, 460 (2011), the Court discussed the parameters of permissible lay opinion testimony from a police officer, explaining that "lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise impermissible hearsay."

The Court held that an officer is permitted to provide "fact testimony," based on "what he or she perceived through one or more of the senses." <u>Ibid.</u> However, "[t]estimony of that type includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." <u>Ibid.</u> Lay opinion testimony "is not a vehicle for offering the view of the witness about a series of facts the jury can evaluate for itself . . . ." <u>Id.</u> at 462.

More recently, in <u>Gonzales v. Hugelmeyer</u>, 441 N.J. Super. 451, 459 (App. Div. 2015), we determined a police officer gave inadmissible lay opinion testimony when he opined about which driver was at fault in a motor vehicle accident. We found that because the officer "had no personal observation or recollection of the accident . . . his opinions . . . failed the foundational requirements of <u>Rule</u> 701," and determined that "a police officer cannot provide an opinion at trial when that opinion is based primarily on the statements of eyewitnesses." <u>Id.</u> at 460 (citation omitted).

Here, Abromaitis's testimony that he believed the document defendant was seen holding was K.G.'s resume constituted an impermissible lay opinion, was not based on personal knowledge, and was dependent on what others told him about K.G.'s resume. Moreover, the jury was able to view the recordings and make its own determination, based on competent testimony, as to whether defendant held K.G.'s resume. We therefore agree the officer's testimony about what he believed defendant was holding constituted inadmissible lay opinion testimony.

Nevertheless, we are convinced that introduction of the testimony was not clearly capable of producing an unjust result. <u>R.</u> 2:10-2. Defendant failed to object to the testimony and we therefore assume that counsel did not consider it to be significant

11

in the context of the trial. See State v. Ingram, 196 N.J. 23, 42 (2008). Moreover, the jury was correctly instructed concerning its role as the finders of fact, and we assume the jury followed the court's instructions. State v. Loftin, 146 N.J. 295, 390 (1996).

Moreover, the overwhelming evidence showed defendant and K.G. together in the parking garage and at his apartment. The surveillance camera recordings show them together at the parking garage, and later the police found K.G. naked and bloody at defendant's apartment building, with defendant lying nearby after being stabbed numerous times. K.G. admitted to stabbing defendant, and defendant's blood was found on K.G.'s back and right leg. K.G. reported she watched the movie Scarface in defendant's apartment, and the police recovered a recording of the movie in defendant's bedroom. Indeed, as defendant acknowledges in his brief, he argued to the jury that he was attacked by K.G. and thus was the victim.

In our view, the detective's opinion about the contents of the envelope was of virtually no probative value. The primary issue in this case was who was the aggressor during the interactions between defendant and K.G. The testimony concerning the resume added little to the resolution of that issue. In addition, K.G. independently testified the envelope defendant held in the surveillance recording contained her resume. In any event,

the admission of the testimony was not clearly capable of producing an unjust result, and defendant fails to make a showing there is a reasonable doubt that admission of the testimony may have "led the jury to a result it otherwise might not have reached." R.B., 183 N.J. at 330.

## B.

Defendant next argues that because Schiffner testified in detail concerning the findings supporting her forensic analysis of the DNA evidence, it was error to admit her report. Relying on our decisions in Schneiderman v. Strelecki, 107 N.J. Super. 113 (App. Div. 1969), and Corcoran v. Sears Roebuck, 312 N.J. Super. 117, 126 (App. Div. 1998), defendant argues that "[w]hen a person fully testifies her report is not also permitted to be introduced into evidence."

Our decision in Schneiderman provides no support for defendant's argument. In Schneiderman, 107 N.J. Super. at 118, we determined that a police report concerning an automobile accident may constitute an admissible business record under N.J.R.E. 63(13) (now codified as N.J.R.E. 803). We explained that although it may have been prejudicial to admit the report "where its contents had been fully developed by the oral testimony," its probative value greatly outweighed any prejudice and the court did

not abuse its discretion by admitting the report in evidence. Id. at 120.

Our decision in Corcoran also does not support defendant's argument. In Corcoran, we considered whether an expert's report was admissible under N.J.R.E. 803(b)(2) as a party's adoptive admission. 312 N.J. Super. at 125-28. We also determined that an expert cannot be cross-examined with a report prepared by a different expert, where the testifying expert did not rely on the secondary report as a basis for his or her opinion. Id. at 130. Our decision in Corcoran, however, is inapposite here because there is no contention that Schiffner's report constituted an adoptive admission under N.J.R.E. 803(b)(2), or was improperly used to cross-examine a witness. Thus, this case presents none of the circumstances extant in Corcoran.

Defendant argues that Schiffner's detailed testimony concerning her analysis of the DNA test results rendered admission of her report unnecessary and prejudicial because it provided the State with "two bites of the apple."[1] Thus, defendant essentially

---

[1] We limit our analysis concerning the admission of the lab report to the arguments asserted in defendant's brief. Any issue not briefed on appeal are deemed waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008); Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001).

14                                                          A-3705-15T4

contends the report was inadmissible under N.J.R.E. 403 because its "probative value is substantially outweighed by the risk of . . . undue prejudice."

We find no merit to this contention. The jury heard detailed testimony from Schiffner concerning the DNA testing and results, and her report. Defendant makes no showing that admission of the report created a risk of undue prejudice, nor could he. The report showed little more than defendant's blood was found on K.G.'s back and right leg, and there was no dispute K.G. stabbed defendant multiple times and was bloodied as a result. The report also showed defendant's saliva may have been found on K.G.'s vagina, but defendant did not dispute he had sexual relations with K.G., and he was acquitted of the aggravated sexual assault charge based on the claim he performed cunnilingus by force. Admission of the report created no risk of undue prejudice to defendant.

Defendant does not claim the report constituted inadmissible hearsay, and we therefore need not address the issue or consider whether the report was admissible under an exception to N.J.R.E. 802. See, e.g., State v. Matulewicz, 101 N.J. 27, 28-32 (1985) (explaining the application of the business records exception, N.J.R.E. 803(c)(6), and the public records exception, N.J.R.E. 803(c)(8), to the admission of a "State Police chemist's" laboratory report); State v. Oliveri, 336 N.J. Super. 244, 249-

251 (App. Div. 2001) (finding a State laboratory report admissible under N.J.R.E. 808); see also State v. Miller, 170 N.J. 417, 426-27 (2002). Based on our review of the record, even if it was error to admit the report, defendant fails to make any showing the error was clearly capable of producing an unjust result. R. 2:10-2.

## C.

Defendant next claims he was deprived of a fair trial because of errors in the initial verdict sheet submitted to the jury. He contends the errors were not corrected until after the jury first reported it had resolved "most of the charges but remain[ed] at an impasse on others," and that the court never determined if the errors caused any confusion.

The initial verdict sheet included questions that were numbered to match the corresponding counts of the indictment.[2] Thus, questions beginning with the number one pertained to the charge in count one, and so on.

---

[2] In his brief, defendant quotes from certain portions of the initial verdict sheet and cites to a verdict sheet in his appendix that does not show the quoted language. Although the verdict sheet about which defendant complains is not included in the appendix, it is of no moment. We glean the verdict sheet errors from the trial record and briefs submitted, and the parties do not dispute the nature of the error contained in the initial verdict sheet.

The court charged the jury on lesser-included offenses for certain offenses charged in the indictment. For the counts that included lesser-included offenses, the verdict sheet first asked how the jury found on the charged count, and directed the jury to respond to the verdict sheet question concerning the lesser-included offense if it found not guilty of the charged offense. For example, question four on the verdict sheet first asked how the jury found on the charge contained in count four. The verdict sheet also instructed that if the jury found defendant guilty of the charge in count four, the jury should proceed to question five, which addressed the charge in count five. However, the verdict sheet instructed that if the jury found defendant not guilty of count four, it should proceed to question "4A," which asked for the jury's verdict on the lesser-included offense charged under count four.

The same framework was employed for the questions related to the charges in counts six through twelve, and the lesser-included offenses for each. The error in the initial verdict sheet on those counts occurred as the result of mis-numbering. For example, question six, which was intended to address count six and its lesser-included offense, directed that if the jury found defendant not guilty of count <u>seven</u>, it should proceed to question "7A," and if it found defendant guilty of count <u>seven</u> it should proceed to

17

count _eight_.  The questions for counts seven through twelve suffered from the same infirmity, with each incorrectly numbering the counts and questions count next above that which was intended.

After two days of deliberations, the jury sent a note to the court stating it "resolved most of the charges but remain[ed] at an impasse on others.  We do not believe we will get resolved without jurors going against their honest conviction.  How to proceed?"  Without objection, the court then instructed the jury in accordance with the relevant Model Jury Charge to continue its deliberations.  See Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013).  The jury then retired to the jury room to continue its deliberations.

The court subsequently notified counsel of the error in the verdict sheet, and provided counsel with a corrected version.  The parties agreed the court would provide a corrected verdict sheet to the jury, and explain the error.  The court informed the jury of the error, gave the jury the corrected verdict sheet, explained the corrected verdict sheet, and instructed the jury that its verdict must be unanimous.

The jury later reported its verdict based on the corrected verdict sheet.  The foreperson reported the jury's verdict on each count and lesser-included offense in response to the questions

posed on the corrected verdict sheet. The jurors were polled and affirmed their agreement with the verdict announced by the foreperson.

Errors in jury verdict sheets not brought to the attention of the trial court are reviewed for plain error. State v. Galicia, 210 N.J. 364, 386 (2012). We consider "[t]he verdict sheet, in conjunction with the jury charges," in determining whether an error in the verdict sheet constitutes plain error because they "constitute[] the trial court's direction[s] to the jury." Ibid. Where the verdict sheet contains an error, "but the trial court's charge has clarified the legal standard for the court to follow, the error may be deemed harmless." Id. at 387.

In State v. Gandhi, 201 N.J. 161, 198 (2010), the Court rejected the defendant's assertion that a typographical error in the verdict sheet stating he was charged with committing the offenses between June of 2003 and February of 2003, instead of February of 2004, "misled or confused the jury." The Court noted the defendant did not point to any evidence in the record showing the jury was misled or confused. Ibid. The Court determined that "[g]enerally, a mere, and obvious, typographical error would not have the capacity to mislead the jury as to consideration of the elements of the offenses." Ibid.

Moreover, in <u>Gandhi</u>, the trial court gave a jury charge reflecting the correct date. <u>Ibid.</u> The Court held that "[b]ecause the jury did not request clarification, it either understood the correct date or did not deem the inaccuracy on the verdict sheet to affect its determination based on the evidence presented and the court's jury instruction[,]" and the error did not constitute reversible error. <u>Ibid.</u>

Similarly, here, the errors in the initial verdict sheet were "obvious" typographical errors. <u>See ibid.</u> During its final jury instructions, the court explained the verdict sheet in detail, and provided specific directions concerning the verdict sheet's requirements for reporting the jury's determination on counts three and six through twelve, which included lesser-included offenses. The court used count three as an example, explaining the verdict sheet required that

> [i]f your verdict is not guilty to Count Three, then you go to question 3(a), which is immediately below it. If your verdict is guilty on Count Three, then you go to Count Four, then Five and then once you pick up on Six, it follows a — it follows a similar format all the way through.
>
> If you have any questions though, also, on the verdict sheet, just send out a note and I'll be happy to answer it.

Informed by the judge's precise instructions, the jury never questioned the initial verdict sheet and, in our view, the errors were obvious and not capable of causing any confusion.  See ibid.

The errors in the initial verdict sheet were also clearly not capable of producing an unjust result because the court found the errors and corrected them.  The court informed the jury about the errors, and properly instructed the jury to report its verdict by using the corrected verdict sheet.  The verdict was reported based on the corrected verdict sheet, and the record confirms there was no confusion on the jury's part.  The jurors each affirmed their agreement with the verdict announced by the foreperson.  Defendant makes no showing that either the errors in the initial verdict sheet or the court's correction of the errors was clearly capable of producing an unjust result.  R. 2:10-2.

## II.

In counsel's brief and defendant's pro se brief, it is argued that trial counsel provided ineffective assistance by failing to: move for a new trial; object to Abromaitis's testimony concerning the resume; call defendant's treating physician as a witness; object to the admission of Schiffner's report; object to an erroneous verdict sheet; allow defendant to testify; inform defendant of a potential conflict of interest; object to the manner in which the court responded to a note from the jury concerning

the status of its deliberations; and present video footage at trial showing K.G.'s demeanor was consistent with an individual who did not take their medication.  We choose not to address the issues, leaving them for defendant to assert if he seeks post-conviction relief.  State v. Preciose, 129 N.J. 451, 460 (1992).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3705-15T4