**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3711-23

JOANNE MCKOY,

     Plaintiff-Appellant,

v.

JARRETT E. REESE,

     Defendant-Respondent,

and

YOLANDER D. BAKER and
LIBERTY MUTUAL
INSURANCE COMPANY,

     Defendants.

_____

Argued October 23, 2025 – Decided December 4, 2025

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4267-20.

Sherry L. Foley argued the cause for appellant (Michael C. Kazer, PC, and Foley & Foley, attorneys; Michael

C. Kazer, of counsel and on the briefs; Sherry L. Foley and Timothy J. Foley, on the briefs).

Thomas Zuppa, Jr. argued the cause for respondent (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Thomas Zuppa, Jr., of counsel and on the brief).

PER CURIAM

In this auto negligence matter, plaintiff Joanne McKoy appeals from the trial court's June 24, 2024 judgment of "no cause for action" entered in favor of defendant Jarrett E. Reese following a jury trial. The primary issues on appeal are whether the court erred: (1) by allowing defense counsel to read from the medical records of a non-testifying treating physician—which were not admitted into evidence—to impeach plaintiff's expert witness, who did not rely upon those records in formulating his opinion, and allowing defense counsel to reference those records substantively during closing argument; and (2) in ruling plaintiff's subjective complaints contained within the records were statements for purposes of a medical diagnosis or treatment under N.J.R.E. 803(c)(4). We reverse and remand for a new trial.

I.

Defendant stipulated he was responsible for the car accident, and thus, the only issue at trial was whether plaintiff sustained a permanent injury

proximately caused by the collision. The following facts are gleaned from the testimony provided at trial.

Plaintiff testified that on November 22, 2018, she was driving on Garfield Avenue in Jersey City and entering its left-hand lane when defendant's car struck her vehicle, pushing it into oncoming traffic. She indicated her car did not hit another vehicle but described the impact of the collision from defendant's vehicle as "hard," jerking her head, neck, and back. Plaintiff stated she "was in a lot of pain" after the accident because she also hit her knees on the dashboard and bruised her shoulders. Immediately following the accident, she was transported to Jersey City Medical Center, where x-rays were taken of her back, neck, and shoulder. Plaintiff was released that evening and told to take over-the-counter medication.

Plaintiff explained that on November 26, she sought treatment from her long-time primary care physician, Mazhar Elamir, M.D., who had treated her asthma and knee pain in the past. Notably, plaintiff stated Dr. Elamir had never treated her for neck or back issues prior to the accident, and she had never complained to him about neck or back pain. She recalled Dr. Elamir prescribed her Percocet, which she had previously used to treat her knee pain, and referred her to a chiropractor, David Subin, D.C., for further treatment.

Although not admitted into evidence, Dr. Elamir's November 26 medical report was referenced throughout trial in the cross-examination of plaintiff's medical expert, direct examination of defendant's medical expert, and in defense counsel's closing statement. The report contains a heading titled "[s]ubjective," under which, in pertinent part, it states:

> This [fifty-nine-]year[-]old female presents for follow-up of the following problem(s):
>
> 1. R-CHRONIC PAIN
> Patient requesting refill of pain medication.
> . . . .
> Duration: more than [six] months[.]
> Location: back knee[.]

Dr. Subin testified regarding plaintiff's injuries and treatment over the course of fifty-two visits throughout a nine- to ten-month period. He explained plaintiff complained of pain in her neck, back, left hip, knees, and left lateral thigh, along with injuries to the right side of her chest. He "felt that these injuries were due to [the] automobile accident." He had diagnosed plaintiff with "cervical and lumbar sprains and strains," and ordered x-rays and magnetic resonance imaging (MRI) studies of her spine. Dr. Subin noted plaintiff improved during his treatment but did not return to normal.

Plaintiff also offered expert testimony from radiologist Feng Tao, M.D., regarding his review of the MRI studies of plaintiff's cervical and lumbar spine.

4

Dr. Tao concluded plaintiff had a herniated disc at the C4-C5 level of her cervical spine and the L5-S1 level of her lumbar spine.

Plaintiff further retained an orthopedic surgeon, Teofilo Dauhajre, M.D., who provided expert testimony regarding his examination of plaintiff and review of her MRI films. He noted the importance of reviewing the patient's past medical history, physical examinations, and all objective testing before making a diagnosis or treatment recommendation. During his examination of plaintiff, she informed him she had sought treatment from Dr. Elamir, who had examined her, referred her to Dr. Subin for treatment, and recommended x-rays and MRI studies. He recalled plaintiff informing him her neck and lower back had been "completely asymptomatic" prior to the accident.

In reviewing the MRI of plaintiff's cervical spine, Dr. Dauhajre stated "she had a central disc herniation at [the] C4-C5 level." He opined plaintiff "had an aggravation of a pre-exist[ing] cervical condition" from when she fell in the 1980s, which had been asymptomatic since 1986. Accordingly, Dr. Dauhajre concluded her disc herniation at C4-C5 was causally related to the accident.

Dr. Dauhajre also found plaintiff "had disc bulges at the L4-L5 and L5-S1 levels with a superimposed . . . disc protrusion at L5-S1." He labeled the herniated disc at L5-S1 "as an aggravation of . . . her pre-exist[ing] mild lumbar

A-3711-23

sacral spondylosis." He explained he "felt that the accident aggravated [plaintiff's] pre-exist[ing] mild normal developmental degenerative changes." Dr. Dauhajre opined these injuries were "permanent in nature" and "caused by the accident."

On cross-examination, Dr. Dauhajre acknowledged he reviewed Dr. Elamir's records. When counsel questioned him regarding whether Dr. Elamir's November 26, 2018 medical report included a notation plaintiff had "chronic back and knee pain for longer than six months," Dr. Dauhajre answered, "that's what [Dr. Elamir] wrote down, but he didn't mention chronic pain prior to th[e] accident." Defense counsel then asked Dr. Dauhajre if "[he] would agree . . . that Dr. Elamir . . . noted [plaintiff] had . . . [k]nee and back pain for more than six months," to which he responded, "I'd have to see" the records.

Defense counsel provided the records to Dr. Dauhajre and stated, regarding Dr. Elamir's November 26 report, "[y]ou can read along with me . . . . [Fifty-nine]-year-old female presents for follow[-]up of the following problems. Chronic pain, back and knee,[1] more than six months." Counsel then asked Dr.

---

[1] The parties dispute whether Dr. Elamir's notes refer to the back of plaintiff's knee or to both her back and knee. As noted above, the record merely states next to the location of plaintiff's complaint, "back knee."

6

Dauhajre to confirm Dr. Elamir had refilled medication for plaintiff's chronic pain four days after the accident, to which plaintiff's counsel objected.[2]

At sidebar, plaintiff's counsel argued it was improper for defense counsel to read from Dr. Elamir's medical records without calling him as a witness. In response, defense counsel noted plaintiff's counsel had previously questioned Dr. Dauhajre about his review of Dr. Subin's reports and reasoned, "I'm doing the same thing" by asking if Dr. Dauhajre reviewed and relied upon anything in Dr. Elamir's reports. Relying on Manata v. Pereira,[3] plaintiff's counsel argued defense counsel engaged in impermissible "phantom impeachment" because "you can't confront a witness on . . . an out-of-court statement . . . and try to offer it as being true without the patient admitting . . . she even said it," and, therefore, "a hearsay statement from Dr. Elamir" cannot be offered to prove its truth without calling him to testify. However, the court overruled plaintiff's

---

[2] The statement of facts in defendant's brief asserts the following: "Having relied on Dr. Elamir's records in the formation of his opinion, those same records were presented to Dr. Dauhajre on cross-examination." However, there is no citation to the record supporting the assertion Dr. Dauhajre "relied" on Dr. Elamir's records to "form[] . . . his opinion." Rather, Dr. Dauhajre noted he had "no records from any other physicians saying that [plaintiff] was actively being treated for her lower back and knees." Moreover, it appears Dr. Dauhajre did not rely on Dr. Elamir's records as they conflicted with his testimony that plaintiff had no back pain prior to the accident.

[3] 436 N.J. Super. 330 (App. Div. 2014).

objection to strike the testimony because "Dr. [Dauhajre] relied on [Dr. Elamir's] records for his opinion," and plaintiff's counsel had "opened the door" by asking Dr. Dauhajre "to read in [Dr.] Subin's records."

Thereafter, defense counsel continued asking Dr. Dauhajre to confirm the contents of Dr. Elamir's records, including plaintiff's complaints of "knee pain without trauma." On redirect, plaintiff's counsel showed Dr. Dauhajre the November 26 medical report and asked him whether it mentioned plaintiff's complaints of chronic neck pain. Dr. Dauhajre responded he "reviewed the whole record," and, although he "skip[ped] this," he never noticed neck pain mentioned in any of the records. On cross-examination, he also stated there were no records "supporting that [plaintiff] was getting active treatment" prior to the accident.

On re-cross, defense counsel asked Dr. Dauhajre whether he agreed, based on his review of Dr. Elamir's records, that Dr. Elamir conducted "range of motion tests" and treated plaintiff's lower back, to which Dr. Dauhajre answered, "I wasn't there. Let me take a look." Defense counsel also asked why Dr. Elamir's April 2, 2019 report stated plaintiff had "knee pain without any accident or injury," to which he responded, "I don't know why he wrote [that] down." When asked about entries made by Dr. Elamir in which plaintiff's complaints of

8

pain had changed, Dr. Dauhajre replied, "I don't know why he wrote that that day. I wasn't there." Defense counsel then suggested, "[m]aybe [Dr. Elamir] wrote it because that's what . . . plaintiff was telling him."

The following day, plaintiff's counsel moved for the court to reconsider its decision to allow defendant to use Dr. Elamir's records to impeach Dr. Dauhajre. However, the court determined defense counsel's use of Dr. Elamir's records was "fair game" because Dr. Dauhajre had testified he reviewed those medical records in forming his opinion. The court then advised plaintiff's counsel it would allow argument on the issue later in the day, which, according to plaintiff, never happened.

Defendant presented testimony from Alan Miller, M.D., an expert in the field of orthopedic surgery. Dr. Miller testified he "read and reviewed" Dr. Elamir's records, among others, because reviewing "every document" was "important to [his] evaluation." When defense counsel subsequently asked Dr. Miller, again, whether he reviewed Dr. Elamir's records, plaintiff's counsel objected. At sidebar, plaintiff's counsel renewed his objection to defense counsel's inadmissible use of Dr. Elamir's records because neither Dr. Elamir nor a member of his staff had testified at trial. Plaintiff's counsel reasoned defense counsel's use of Dr. Subin's records when cross-examining Dr. Dauhajre

9

was proper because Dr. Subin had testified at trial, unlike Dr. Elamir, whose records constituted inadmissible hearsay. Defense counsel countered that Dr. Elamir's records reflected plaintiff's "subjective complaints," which had been reviewed by Dr. Miller, and would be admissible as statements made for purposes of medical diagnosis or patient history under N.J.R.E. 803(c)(4).

Plaintiff's counsel, in turn, argued there was no evidence plaintiff made the statements contained in the report and emphasized plaintiff previously testified she never complained to Dr. Elamir about back pain. Plaintiff's counsel contended the hearsay exception under N.J.R.E. 803(c)(4) did not apply because Dr. Elamir's report did not include plaintiff's statements, but, rather, was comprised of statements made by Dr. Elamir or his staff. Counsel further asserted that before the hearsay statements within Dr. Elamir's report can be admitted, defense counsel must first satisfy N.J.R.E. 803(c)(6)—the business records exception—and have Dr. Elamir or a custodian of the records explain the statements supposedly attributed to plaintiff. Plaintiff's counsel contended he would not "stipulate to [N.J.R.E.] 803(c)(6)" because the statements were "just not trustworthy."

In response, defense counsel indicated his questions to Dr. Miller would be "limited to several visits about what plaintiff said" to Dr. Elamir on "certain

dates" regarding the location and duration of her complaints of pain, and all references to diagnosis or testing would be avoided. Regarding plaintiff's argument about defendant's "phantom impeachment," the court stated, "[t]hat's interesting. But this [is] not a phantom statement" because "[t]hese [we]re statements made to [plaintiff's] treating doctor on various dates." The court further reasoned, "what is not trustworthy about what a patient tells their treating doctor? You know, what their complaints were on that particular day of treatment," and "[i]f we can't trust a treating doctor's records, then . . . what . . . do we trust?"

The court then determined, over plaintiff's objections, neither Dr. Elamir nor his staff needed to testify about the records at trial because plaintiff's "own treating doctor's records" fell "squarely under [N.J.R.E.] 803(c)(4) . . . as a past or present symptom to a doctor for the purposes of treatment." By extension, the court also denied plaintiff's counsel's motion to strike the portions of Dr. Dauhajre's cross-examination referencing Dr. Elamir's records because plaintiff made the same arguments and relied on the same reasoning as in his objection to Dr. Miller's testimony. Accordingly, the court found "these records fit under [N.J.R.E.] 803(c)(4) directly." Thereafter, defense counsel proceeded to ask Dr. Miller questions regarding what plaintiff reported to Dr. Elamir on various dates,

11

including where plaintiff initially told Dr. Elamir she felt pain, how long those complaints persisted, and the decrease in plaintiff's subjective complaints over time.

At the beginning of defense counsel's closing argument, he noted to the jury that it had "heard a lot about Dr. Elamir." He stated plaintiff saw Dr. Elamir four days after the accident, complaining of back and knee pain, and highlighted how plaintiff's complaints to Dr. Elamir changed with each visit. Counsel specifically noted a report from an April 12, 2021 visit stated "[m]id to low back pain" and that plaintiff said it was "non-radiating." Defense counsel further indicated the report from the last day of plaintiff's visit with Dr. Elamir made "no mention of [her] being in any pain." It was not until later in the argument that counsel tied Dr. Dauhajre's "poor review" of Dr. Elamir's records to Dr. Dauhajre's credibility.

During the charge conference, the court denied plaintiff's request to instruct the jury in accordance with Model Jury Charges (Civil), 1.13E, "Optional Charge Concerning Experts Relying on Hearsay Statements of Non-Testifying Experts" (rev. Oct. 2015), because it determined the charge only applies to situations in which testifying experts rely on non-testifying expert opinions, as opposed to the complaints of a plaintiff. The court further noted

"that charge is very confusing" and expressed its belief the jury would likely have a difficult time understanding it.

During deliberations, the jury asked the court a single question: "What was the Percocet for[?] [B]ack and/or knee?" The court answered the question by advising the jurors they had to "rely on [their] own recollection." Thereafter, the jury returned a unanimous verdict, finding plaintiff failed to prove she sustained a permanent injury proximately caused by the accident. Accordingly, the trial court entered a June 24, 2024 judgment of no cause of action, dismissing plaintiff's complaint with prejudice.

II.

Plaintiff argues the court made evidentiary errors warranting a new trial because it allowed defense counsel to engage in an impermissible "phantom impeachment" of Dr. Dauhajre and cross-examine him "with the hearsay contained in Dr. Elamir's records" merely because he "reviewed" those records. She further asserts the court misapplied its discretion because it failed to address the hearsay-within-hearsay issue regarding Dr. Elamir's records, and, instead, permitted the defense to read the hearsay statements into the record without laying a proper foundation.

A trial court's evidentiary determinations are entitled to "substantial deference." State v. Cole, 229 N.J. 430, 449 (2017). "In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). "Evidentiary decisions are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

An abuse of discretion arises "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). "[W]e will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting Green, 160 N.J. at 492). However, an evidentiary decision is reviewed de novo if the trial court applies the wrong legal standard in deciding to admit or exclude the evidence. Hassan v. Williams, 467 N.J. Super. 190, 214 (App. Div. 2021).

"Extensive cross-examination of experts is generally permitted, subject to reasonable limitations imposed by the trial court in its discretion." Nowacki v. Cmty. Med. Ctr., 279 N.J. Super. 276, 290 (App. Div. 1995). "Counsel is permitted to attack the credibility of a witness on cross-examination." Parker v. Poole, 440 N.J. Super. 7, 22 (App. Div. 2015) (citing N.J.R.E. 611(b)). However, "[t]he law places limits on cross-examination for reasons of both practicality and logic." State v. Silva, 131 N.J. 438, 444 (1993).

## A.

Plaintiff argues the trial court erred in permitting defense counsel to use Dr. Elamir's records to impeach Dr. Dauhajre. According to plaintiff, defense counsel improperly used her hearsay statements, contained within Dr. Elamir's records, to prove she suffered chronic back and knee pain prior to the accident by reading from those records without calling Dr. Elamir or a member of his office as a witness. She cites Manata v. Pereira for the proposition that defendant impermissibly engaged in "phantom impeachment" because defense counsel read from Elamir's report—which was not admitted into evidence—and asked Dr. Dauhajre to confirm the substance of that report.[4]

_____

[4] 436 N.J. Super. at 347 (quoting James McElhaney, Phantom Impeachment, 77 A.B.A.J. 82 (Nov. 1991) (explaining "phantom impeachment" is "the

Plaintiff avers the court incorrectly found the statements did not constitute "phantom statements" because they were out-of-court statements, in unauthenticated records, offered to prove the truth of the matter asserted. She further argues the trial court misinterpreted N.J.R.E. 703 by allowing defense counsel to question Dr. Dauhajre and Dr. Miller about the hearsay statements contained within Dr. Elamir's records simply because they "reviewed" the records. Plaintiff contends N.J.R.E. 703 prohibited defense counsel from reading this inadmissible evidence into the record, as neither Dr. Dauhajre nor Dr. Miller testified they "relied" on Dr. Elamir's records as a basis for their opinions. She also relies on Agha v. Feiner[5] for the proposition that a party cannot use expert testimony as a vehicle to introduce otherwise inadmissible evidence. In short, plaintiff maintains the court allowed the introduction of inadmissible evidence under the "guise" of assessing the experts' bases for formulating their opinions.

It is understood that proving an injury to vault the verbal threshold under the Automobile Insurance Cost Reduction Act, N.J.S.A. 39:6A-1.1 to -35, is a

---

contradiction of a witness on 'key testimony . . . by someone who never takes the stand and who never says a word in court'")).

[5] 198 N.J. 50, 63 (2009).

two-fold process, requiring "a showing of both causation and permanency." Espinal v. Arias, 391 N.J. Super. 49, 58 (App. Div. 2007).  A permanent injury occurs when a damaged "body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment."  N.J.S.A. 39:6A-8(a).  A plaintiff must prove the existence of a permanent injury based on "objective clinical evidence."  Escobar-Barrera v. Kissin, 464 N.J. Super. 224, 234 (App. Div. 2020).  "[T]he necessary objective evidence must be 'derived from accepted diagnostic tests and cannot be "dependent entirely upon subjective patient response."'"  Agha, 198 N.J. at 60 (quoting Davidson v. Slater, 189 N.J. 166, 181 (2007) (quoting N.J.S.A. 39:6A-8(a))).

N.J.R.E. 703 allows a testifying expert to refer to hearsay statements, such as a medical report prepared by a non-testifying expert.  Agha, 198 N.J. at 63.  Specifically, it states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pursuant to Rule 703, reference to hearsay facts or data is permissible only for the limited purpose of understanding the basis of the testifying expert's

17

opinions, not for the truth of the matter asserted.  Agha, 198 N.J. at 63-64.  Our Supreme Court articulated the Rule "does not allow expert testimony to serve as 'a vehicle for the wholesale [introduction] of otherwise inadmissible evidence,'" and it is "not intended [to be] a conduit through which the jury may be provided the results of contested out-of-court expert reports."  Id. at 63 (first alteration in original) (quoting State v. Vandeweaghe, 351 N.J. Super. 467, 480-81 (App. Div. 2002) (internal quotation marks omitted)).

Accordingly, although "a testifying physician may apprise the trier of fact of the bases for [their] opinion, including the opinions of other experts," nothing in Rule 703 "entitle[s] a litigant to introduce an out-of-court expert's report for its 'truth,' where it is critical to the primary issue in the case and the adversary objects."  Id. at 67.  The Agha Court emphasized the importance of providing a limiting instruction to the jury where a testifying expert refers to facts or data from a non-testifying expert, noting "where an expert references the report of a non-testifying expert to explain the basis of [their] own opinion, it is incumbent upon the trial judge, upon request, to instruct the jury regarding its limited use."  Id. at 63-64 (citing N.J.R.E. 105).  Even when there is no request, the judge should give the limiting instruction "sua sponte where it is necessary to avoid an unjust result."  Id. at 63 n.7.

In <u>James v. Ruiz</u>, we reiterated the "overarching principle" set forth in <u>Agha</u>: "to disallow the substantive admission of hearsay assertions of a non-testifying [expert] for their truth." 440 N.J. Super. 45, 66 (App. Div. 2015). There, the central issue involved an expert witness's review of a non-testifying expert radiologist's report that was not admitted in evidence. <u>Id.</u> at 54-55, 61. We held an attorney may not "question[] an expert witness at a civil trial, either on direct or cross-examination, about whether that testifying expert's findings are consistent [or inconsistent] with those of a non-testifying expert who issued a report in the course of an injured plaintiff's medical treatment" if "the manifest purpose of those questions is to have the jury consider for their truth the absent expert's hearsay opinions about complex and disputed matters." <u>Id.</u> at 51.

We also addressed in <u>James</u> the use, under N.J.R.E. 703, of facts and data relied upon by a testifying expert that are derived from a non-testifying expert, explaining the impact of Rule 703 is to limit a testifying expert from conveying to a jury facts and data "set forth in a hearsay report issued by a non-testifying expert." <u>Id.</u> at 64-66. That is, "the testifying expert may not serve as an improper conduit for substantive declarations (whether they be objective or subjective in nature) by a non-testifying expert source." <u>Id.</u> at 66. Hence, "an expert may give the reasons for his opinion and the sources on which he relies,

but that testimony does not establish the substance of the report of a non-testifying physician." Id. at 69 (emphasis omitted) (quoting Agha, 198 N.J. at 64).

Additionally, in James, we observed the "case law in our State has traditionally admitted 'routine' findings of experts contained in medical records that satisfy the business record exception, but . . . excluded 'diagnoses of complex medical conditions' within these records." Id. at 63 (quoting State v. Matulewicz, 101 N.J. 27, 32 n.1 (1985)). This court recognized an expert may be cross-examined with such records "to show that the defense expert's review of the patient's records was skewed or incomplete," as this "would amount to simply impeachment of the defense expert's credibility, an attack that does not hinge upon the actual truth of the absent declarant's statements." Id. at 75. We noted this form of impeachment is appropriate because it could "expose the weaknesses of an expert's testimony" and thus "assist in the search for the truth, one of the recognized goals of our law of evidence." Ibid. (citing N.J.R.E. 102).

Importantly and fundamentally, however, in James, we highlighted the "general if not immutable proposition, that '[i]t is improper to cross-examine a witness about inadmissible hearsay documents upon which the expert has not relied in forming [their] opinion.'" Id. at 76 (alteration in original) (quoting

Corcoran v. Sears Roebuck & Co., 312 N.J. Super. 117, 130 (App. Div. 1998)). We added, "the probative value of such a line of impeachment must be carefully weighed against the very realistic potential for juror confusion, undue prejudice, and other countervailing considerations under N.J.R.E. 403," particularly where the absent expert's opinion is not in evidence, creating "a significant danger that the jurors will misuse that proof substantively in spite of a limiting instruction." Ibid.

We conclude the court erred in allowing defense counsel to cross-examine Dr. Dauhajre regarding plaintiff's statements contained in Dr. Elamir's records. Dr. Elamir's records were not admitted into evidence, and Dr. Elamir did not testify. Accordingly, the records were hearsay, and plaintiff's alleged statements contained therein constituted embedded hearsay. Although Rule 703 allows an expert to refer to hearsay statements, there are limitations. The record lacks any indication Dr. Dauhajre relied on plaintiff's purported statements found in Dr. Elamir's records. Defendant's contention, Dr. Dauhajre was "relying on his review of Dr. Elamir's records" in concluding plaintiff was asymptomatic and did not have back pain prior to the accident, is belied by Dr. Dauhajre's testimony.

Rather, Dr. Dauhajre's testimony reflects his reliance on plaintiff's statements made to him during his examination. He stated, "[plaintiff] told me that her lower back was completely asymptomatic prior to th[e] accident," and further testified, "she told me that her neck was completely asymptomatic." (Emphasis added). Dr. Dauhajre further noted, "[a]ccording to the patient, she was asymptomatic, and I had no other medical records supporting that she was seeing another doctor or chiropractor or getting any other work up . . . since 1986." (Emphasis added). Although Dr. Dauhajre later testified on cross-examination he reviewed Dr. Elamir's medical records, there was no indication he relied upon the records to formulate his opinion. Indeed, on redirect, when plaintiff's counsel asked him if Dr. Elamir's November 26, 2018 record referenced "chronic pain" in the neck, Dr. Dauhajre responded, "I reviewed the whole record[, but] I did skip this."

Because Dr. Dauhajre did not testify he relied on the portion of Dr. Elamir's records that conflicted with plaintiff's statements to him, it was improper for defense counsel to invite Dr. Dauhajre to "read along" with him from Dr. Elamir's records. This only served to apprise the jury of plaintiff's purported subjective complaints contained within a hearsay document that was

not admitted into evidence—the contents of which Dr. Dauhajre reviewed but did not rely upon.[6]

Accordingly, the court misapplied its discretion in allowing defense counsel to cross-examine Dr. Dauhajre regarding "inadmissible hearsay documents upon which the expert has not relied in forming his opinion." See Corcoran, 312 N.J. Super. at 130.[7] However, defendant would not be precluded from challenging Dr. Dauhajre's credibility concerning his failure to consider Dr. Elamir's records in formulating his opinion. As we noted in James, "we recognize that an expert's refusal to rely on or consider such identified material may, in and of itself, be some evidence of the expert's alleged bias or lack of thoroughness." 440 N.J. Super. at 76.

Even assuming defense counsel's cross-examination of Dr. Dauhajre was permissible, the court erred by failing to issue an appropriate limiting instruction to the jury concerning the manner in which it should consider the hearsay

---

[6] Defendant's argument that plaintiff's counsel questioning Dr. Dauhajre about Dr. Subin's records made it proper for defense counsel to question Dr. Dauhajre regarding Dr. Elamir's records is unpersuasive. Dr. Dauhajre never testified he relied on Dr. Elamir's records. Moreover, Dr. Subin was called as a witness at trial, unlike Dr. Elamir.

[7] Because we conclude the court erred based on our analysis under Agha and James, we need not address plaintiff's "phantom impeachment" argument.

A-3711-23

statements from Dr. Elamir's records. A central issue in this case concerned whether plaintiff had pre-existing back complaints prior to the accident, and plaintiff's objections arose from defendant's attempt to introduce portions of Dr. Elamir's records to establish plaintiff suffered from such a pre-existing condition. Dr. Elamir was not subject to cross-examination, and his records, including plaintiff's alleged statements, were improperly discussed under the guise they were being used to impeach Dr. Dauhajre's testimony. However, defense counsel's use of those statements was not restricted to impeaching Dr. Dauhajre's testimony. Rather, they were also used substantively in defense counsel's closing argument—untethered to any challenge to the bases for Dr. Dauhajre's opinion—for the truth of the matter asserted, to demonstrate plaintiff was not credible and her injuries were not attributable to the accident. This exemplifies the "perils" of misusing such hearsay that we cautioned against in James. See 440 N.J. Super. at 77. Regardless, the court denied plaintiff's request for a limiting instruction to provide guidance to the jury regarding how it was to consider plaintiff's alleged statements in Dr. Elamir's records.

Although James involved an attempt to admit the substance of a non-testifying expert's opinion regarding a complex medical diagnosis "through the proverbial 'back door,'" the same the principles delineated there are applicable

24

here, where defendant sought to elicit plaintiff's subjective complaints of pain from Dr. Elamir's records, despite those records not being admitted into evidence. See id. at 72. That is, because plaintiff's purported statements within Dr. Elamir's report were presented to the jury, the court should have instructed the jury to not consider those hearsay statements as substantive proof, but rather only for the sole purpose of explaining the bases of the witness's opinion and assessing the quality of their testimony.[8]

Model Jury Charges (Civil), 1.13E, "Optional Charge Concerning Experts Relying on Hearsay Statements of Non-Testifying Experts" (rev. Oct. 2015) provides:

> In this case, you have heard that other non-testifying experts have examined the plaintiff[ or] treated the plaintiff . . . and have rendered reports expressing opinions as to their findings.
>
> Testifying experts may rely upon such out[-]of[-]court statements contained in such reports in formulating their opinions if they are of the type reasonably relied upon by experts, within that particular field in forming opinions or inferences upon the subject.

---

[8] The jury's sole question to the court demonstrates the need for the requested charge. The jury posed a question about the critical note of Dr. Elamir that was in dispute. Without a limiting instruction, the jury would have no way to distinguish between using Dr. Elamir's record substantively or to attack or support the bases for Dr. Dauhajre's or Dr. Miller's testimony.

I instruct you, as the jury in this case, that you are not to consider any such out[-]of[-]court statements or opinions by any non-testifying experts as substantive proof and you should not speculate as to what those statements or opinions are or were.

The fact that a testifying expert [relied upon or failed to rely upon] reports of a non-testifying expert [or considered and rejected such a report] may be considered by you for the limited purpose of the witness explaining the basis of [their] opinion, if it is a factor in such opinion, and your assessing the quality of [their] testimony and for no other purpose.

[(Sixth and seventh alterations in original) (second and third emphases added).]

By its terms, the model charge is not limited to opinions of non-testifying experts but also includes "statements,"[9] which would encompass plaintiff's purported statements within Dr. Elamir's records in this matter.

Because the jury was not instructed on how to properly consider the hearsay evidence—for the limited purpose of assessing the bases of the experts' opinions—there was a risk it would consider the hearsay testimony and defendant's closing argument substantively, for the truth of the matter, thereby tainting the verdict. See Kotler v. Nat'l R.R. Passenger Corp., 402 N.J. Super. 372, 380-81 (App. Div. 2008) (vacating a verdict and remanding for a new trial

---

[9] The statements referred to in this charge also include routine findings by non-testifying experts, such as vital signs. See James, 440 N.J. Super. at 63.

where inadmissible evidence had been presented to the jury, and defense counsel "compounded" its erroneous admission by referring to it in closing arguments). Model Charge 1.13E would have clarified for the jury the limited purpose for which it could consider references to plaintiff's alleged statements in Dr. Elamir's records. However, without proper instruction, the jury lacked understanding as to how to assess the hearsay testimony and defendant's closing argument, creating a risk it would be used substantively, thereby prejudicing plaintiff. Accordingly, plaintiff was deprived of a fair trial, and we are constrained to reverse and remand for a new trial.

On remand, defense counsel may not cross-examine Dr. Dauhajre regarding plaintiff's purported statements contained in Dr. Elamir's records unless it is first established Dr. Dauhajre relied on the records. Otherwise, defendant will be limited to attacking Dr. Dauhajre's bias for failing to rely on Dr. Elamir's records. If Dr. Dauhajre acknowledges he relied on Dr. Elamir's records in formulating his opinion, or if defendant's expert, Dr. Miller, relied on the records and references the disputed statements in Dr. Elamir's records, the jury should be provided an appropriate limiting instruction.

B.

Although we have determined this matter must be remanded for a new trial, we address plaintiff's remaining contentions on appeal to provide guidance for the trial court on remand. Plaintiff argues the court misapplied its discretion in finding Dr. Elamir's records fell within N.J.R.E. 803(c)(4) as statements made for purposes of a medical diagnosis or treatment. She contends although defendant did not formally seek to admit the medical records into evidence, he nevertheless used the statements for the truth of the matter asserted and read Dr. Elamir's reports into the record. Plaintiff avers, "the statements the defense sought to use were hearsay contained within a record that was hearsay." According to plaintiff, the court erred by not requiring defendant to first establish Dr. Elamir's records satisfied a hearsay exception, such as the business records exception under N.J.R.E. 803(c)(6). She further argues the court improperly allowed the use of the records despite not being properly authenticated. Plaintiff also asserts defense counsel improperly referenced Dr. Elamir's records in his closing argument.

Hearsay is defined as a statement: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c).

A-3711-23

Hearsay is inadmissible unless it falls within an applicable exception. N.J.R.E. 802. When a statement contains multiple layers of hearsay, every layer must satisfy a hearsay exception for the statement to be admissible. N.J.R.E. 805.

A statement for purposes of medical diagnosis or treatment is an exception to the rule against hearsay, provided the statement: "(A) is made in good faith for purposes of, and is reasonably pertinent to, medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." N.J.R.E. 803(c)(4). "[T]o be admissible[,] the patient must have believed that the statement would enable the doctor to treat," because "[r]eliability is based on the declarant's belief that a doctor will properly treat [them] if the doctor is told the truth concerning the ailment." State in the Int. of C.A., 201 N.J. Super. 28, 33-34 (App. Div. 1985).

Moreover, the business records exception under N.J.R.E. 803(c)(6) is often implicated where a party seeks to admit "a hearsay statement . . . contained within a document that was itself hearsay." Konop v. Rosen, 425 N.J. Super. 391, 402-03 (App. Div. 2012). This exception states:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business

and it was the regular practice of that business to make such writing or other record.

This exception does not apply if the sources of information or the method, purpose[,] or circumstances of preparation indicate that it is not trustworthy.

[N.J.R.E. 803(c)(6).]

To satisfy the business records exception, a proponent must demonstrate: (1) "the writing [was] made in the regular course of business"; (2) was "prepared within a short time of the act, condition[,] or event being described"; and (3) "the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 347 (2010) (first alteration in original) (quoting Matulewicz, 101 N.J. at 29 (internal quotation marks omitted)). A custodian of the records or other qualified witness can testify that the proffered records meet the required N.J.R.E. 803(c)(6) criteria. See Konop, 425 N.J. Super. at 402-04.

The trial court misapplied its discretion by finding plaintiff's statements qualified as statements for purposes of a medical diagnosis or treatment under Rule 803(c)(4) without first addressing whether Dr. Elamir's report was admissible under an applicable hearsay exception. Specifically, defense

counsel's substantive use of the statements contained within the medical records presented a hearsay-within-hearsay issue the court did not address.

Even assuming plaintiff's complaints of pain to her treating physician "squarely" fell within Rule 803(c)(4) as statements for purposes of a medical diagnosis or treatment, those statements were embedded within a document that was, itself, hearsay. Dr. Elamir's records—the first level of hearsay—must satisfy an exception before the court can determine whether plaintiff's statements contained within the reports—the second level of hearsay—are admissible for their truth under Rule 803(c)(4). Consequently, each level of hearsay needed to meet an exception. However, the court permitted defense counsel, when questioning Dr. Dauhajre and Dr. Miller, to read to the jury the contents of an unauthenticated document that had not been admitted into evidence, without first requiring a proper foundation be laid establishing Dr. Elamir's medical reports satisfied the business records exception under Rule 803(c)(6). Accordingly, the court's ruling on the admissibility of plaintiff's statements was premature, as it was made without first determining whether Dr. Elamir's records, themselves, were admissible, which required authentication through testimony from either a custodian or Dr. Elamir under Rule 803(c)(6).

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*m.C. Hanley*

Clerk of the Appellate Division

31

A-3711-23